COMMONWEALTH vs. JOHN D. BEAUDRY, JR.

No. 03-P-419.

Hampshire. March 8, 2004. - May 9, 2005.

Present: GREENBERG, BROWN, & SMITH, JJ.

Further appellate review granted, 445 Mass. 1101 (2005).

*Rape. Indecent Assault and Battery. Evidence,* Privileged communication, Sexual conduct, Credibility of witness. *Privileged Communication. Practice, Criminal,* Argument by prosecutor.

At the trial of indictments charging rape, indecent assault and battery, and open and gross lewdness, the reasonable limitations placed by the judge on the defendant's use of the victim's privileged medical records did not deprive the defendant of the opportunity to adduce important exculpatory evidence. [490-493]

At the trial of indictments charging rape of a child, indecent assault and battery on a child, and open and gross lewdness, statements by the prosecutor in closing argument, which suggested to the jury that the victim possessed age-inappropriate knowledge that could have been derived only from the acts of abuse alleged in the indictments, were permissible, where the record contained a marginally adequate foundation for such an argument that excluded other possible sources of such knowledge, where the judge gave a forceful charge on the jury's proper use of closing argument, and where the issue of sexual precocity was not likely to have weighed heavily in the jury's deliberations [493-498]; further, where it was not clear that the prosecutor had actual knowledge (not disclosed to the jury) of an alternative source for the age-inappropriate sexual knowledge contained in the victim's testimony, it could not be said that the prosecutor, in making the argument, knowingly purveyed false or misleading information to the jury in violation of Mass.R.Prof.C. 3.3(a)(4) [498-500].

At the trial of indictments charging rape of a child, indecent assault and battery on a child, and open and gross lewdness, the judge's emphatic instructions were sufficient to cure any error arising from statements made by the prosecutor in closing argument, which suggested that the victim was inherently credible merely because she testified at trial. [500-502]

INDICTMENTS found and returned in the Superior Court Department on July 11, 2000.

A motion for access to privileged records was heard by *Bertha D. Josephson,* J., and the cases were tried before her.

*Jane Larmon White*, Committee for Public Counsel Services, for the defendant.

*Judith Ellen Pietras*, Assistant District Attorney, for the Commonwealth.

BROWN, J. The defendant was convicted by a Superior Court jury of rape of a child, G. L. c. 265, § 23 (three counts), indecent assault and battery of a child under the age of fourteen, G. L. c. 265, § 13B (four counts), and open and gross lewdness, G. L. c. 272, § 16. Further, in subsequent jury-waived proceedings, the defendant pleaded guilty to indecent assault and battery on a child under the age of fourteen as a second or subsequent offense, G. L. c. 265, § 13B (four counts). On appeal, the defendant alleges that (1) the judge erred in preventing the defendant from using the victim's medical records for impeachment purposes; and (2) the prosecutor's closing argument was improper in multiple respects. We affirm.

We begin by drawing a detailed sketch of the evidence presented at trial. The victim is the defendant's daughter, the product of his former marriage to Darlene Faquoseh. The couple separated in 1990 when the victim was about a year old, at which time Faquoseh moved to Florida, taking the victim with her. The defendant had little or no contact with the victim from the time he and Faquoseh separated until the events that gave rise to the charges at issue here some eight years later.

In the summer of 1998, Faquoseh contacted the defendant and informed him that she could no longer care for the victim, who was then nine years old. The victim, according to Faquoseh, had developed severe emotional problems that caused her to become violent toward members of her family. The defendant testified that Faquoseh informed him that unless he was willing to care for the victim in his home in Massachusetts, Faquoseh planned to have the victim placed in a residential care facility. The defendant consented to take custody of the victim.

When the victim first arrived in Massachusetts, she lived with her paternal grandmother. Within a few weeks, however, she and her grandmother moved into the defendant's apartment. The victim had difficulty making friends in Massachusetts, and frequently spoke to her mother about feeling homesick. She was

not permitted to return to Florida for Christmas as she had requested.

Sometime during March, 1999, a telephone call was placed to Faquoseh, possibly by the victim's grandmother, to discuss the victim's increasingly disruptive behavior. According to Faquoseh, the victim again asked during this call if the victim could visit Florida. Faquoseh told the victim that she would not consider allowing a visit until the end of the school year. Immediately thereafter, the victim made her first accusations of sexual abuse against her father.

After making the disclosures of abuse, the victim was taken from the defendant's home to stay with other relatives who lived nearby. There was evidence that the victim telephoned her mother in Florida the next morning and admitted that she had falsely accused her father of abuse. Nonetheless, the victim was sent home to Florida. Her mental state apparently declined upon her return, and the victim was ultimately institutionalized for about one week. Other relevant facts are included in our analysis as necessary.

1. *Use of victim's medical records for cross-examination.* Before trial, the defendant filed a motion, in accordance with the procedures set out in *Commonwealth* v. *Bishop*, 416 Mass. 169 (1993), to admit "information contained within [medical] records made available to his counsel after in camera review by the Court."[1] During the motion hearing, the defendant indicated that the medical records at issue would be essential to rebut anticipated inculpatory evidence that the victim's behavior was markedly different before and after her stay in Massachusetts. On the basis of the government's approach before the grand jury, the defendant anticipated that the Commonwealth would seek to prove that the victim showed signs of mental illness after her return to Florida, not present before she left, and inferentially attributable to the defendant's abuse. However, according to the defendant (and not disputed by the government), the victim's medical records disclosed that she suffered from

---

[1]To be specific, the principal documents in question include Wing Memorial Hospital/Griswald Center records; a Family Service Center evaluation; Medfield Hospital records; Morton Plant Hospital records; and a Florida Protective Services report.

mental illness sufficiently severe to warrant hospitalization just a few months before she went to stay with her father. As defense counsel argued at the motion hearing, "[b]oth the records of what her behavior was prior to leaving [for] Massachusetts and upon her return[,] the facts show in essence very similar behavior."

For its part, the government did not argue at the motion hearing that the contested medical records evidence should be categorically excluded. Rather, the Commonwealth conceded that if witnesses "testif[y] opposite of what the [medical] records said, [the defendant] has the right to criticize any inconsistencies." With regard to any specific fact contained in the privileged records, the government quite reasonably took the view that admissibility "is going to depend on the testimony as it comes out in trial." The motion judge, who was also the trial judge, apparently agreed, forgoing any pretrial ruling on the defendant's motion.

At trial, the issue of the victim's mental health status took shape more or less as predicted by the defendant during the motion hearing. During cross-examination, Faquoseh resisted defense counsel's efforts to elicit evidence that the victim had evinced signs of serious mental illness in the period immediately before she went to live with the defendant. In particular, defense counsel struggled to establish that the victim had been violently assaultive toward her siblings before moving to Massachusetts. The defendant now contends that the judge prevented him from mounting an effective defense by placing unreasonable limits on his use of the *Bishop* materials during the trial. We disagree.

Notwithstanding the defendant's arguments to the contrary, the judge, in fact, permitted the defendant to make ample use of the *Bishop* records for the purpose of impeaching Faquoseh or in order to refresh her recollection of her prior statements. Admittedly, the judge restricted defense counsel to the use of records pertaining to events "within a reasonable period of time" before and after the victim's stay with the defendant. This limitation, however, was reasonably tailored to ensure that only relevant material, probative of issues actually in dispute, were admitted. Further, defense counsel did not lodge an objection to the judge's ruling. Finally, and perhaps most important,

the documents to which the judge granted defense counsel ac-
cess were, in fact, sufficient to accomplish defense counsel's
stated aims — i.e., to compel Faquoseh to admit that the victim
had been assaultive to her siblings right up to the time she left
for Massachusetts to live with the defendant, and otherwise
paint a picture of the serious mental health problems that af-
flicted the victim *before* the assaults by the defendant occurred.

We note as an aside that the victim's troubled mental state —
including incidents of violence toward her siblings — before
leaving Florida was well-established by the testimony of other
witnesses apart from Faquoseh, including the victim herself.
Indeed, on direct examination the following exchange occurred:

> THE PROSECUTOR: "Do you know why you came to Mas-
> sachusetts?"
>
> THE VICTIM: "Yes I do. Because I was very violent with my
> family. . . ."
>
> THE PROSECUTOR: "When you say you were violent with
> your family, who in your family were you violent with?"
>
> THE VICTIM: "I was violent with my mom and my sisters. I
> used to hit them . . . ."
>
> THE PROSECUTOR: "Was it only your mom and your sisters
> that you were violent toward?"
>
> THE VICTIM: "After my mom's fiancé moved in, I started
> being violent to him."

The victim also conceded, inter alia, that she had received
mental health counseling in Massachusetts before any abuse by
the defendant had occurred.

In the end, we are unpersuaded that any of the reasonable
limitations placed by the judge on the defendant's use of the
*Bishop* records deprived him of the opportunity to adduce
important exculpatory evidence. During trial, the defendant
made multiple requests to use the *Bishop* materials; in each
instance the judge either granted the defendant's request, albeit
with limitations, or indicated that she would revisit the issue if

defense counsel were unable to adduce the evidence he sought by other means. Defense counsel never objected to the judge's various rulings, a strong indication that the limits imposed did not, in fact, prejudice the defendant's cause.

To a great extent, the defendant's arguments on this point reflect efforts by appellate counsel, with the benefit of hindsight and far removed from the pressures of trial, to ferret out missed opportunities for impeachment in the *Bishop* materials. There is no question that alternate approaches were open to trial counsel. However, the tactics he pursued, while ultimately unavailing, were indisputably sound. Moreover, he was by no means hamstrung in his efforts by any stinginess on the part of the judge with respect to the *Bishop* records. Indeed, quite the opposite. There was no error.[2]

2. *The prosecutor's closing argument.* The defendant has identified two discrete defects in the prosecutor's closing argument. Specifically, he faults the prosecutor for (a) suggesting to the jury that the victim possessed age-inappropriate sexual knowledge that could have been derived only from the acts of abuse alleged in the indictments, despite the fact that the claim was contradicted by facts known to the prosecutor (although not in evidence); and (b) mischaracterizing the law relating to

---

[2]We note that the defendant spends considerable time in his brief discussing the limits the judge placed on defense counsel's access to medical records pertaining to the victim's history of hallucinations, an issue that does not seem to have been a matter of much contention at trial. The defendant's appellate arguments notwithstanding, the judge permitted defense counsel, upon request, to use the victim's medical records to probe her history of hallucinations, at least during times relevant to the events at issue here. Defense counsel made no objection to the judge's ruling and thereafter questioned the victim about hallucinations without incident. The issue arose again after the prosecutor's closing argument, when defense counsel complained that the prosecutor had capitalized on the defendant's limited access to the *Bishop* materials by suggesting that the victim had never suffered from hallucinations when, in fact, the records arguably suggest otherwise (but from a period deemed too remote to be relevant by the judge). Fairly read, the prosecutor's closing argument merely indicated that the victim's description of the sexual assaults were not hallucinations. In any event, the judge erased all possibility for prejudice by forcefully instructing the jury that "[t]he matter of any hallucinations [the victim] is alleged to have suffered was admitted solely on the issue of her mental state at the time of the allegations being made. And that evidence was admitted solely for that purpose and should be used solely for that purpose."

standards for assessing the credibility of witnesses. We consider each of these arguments in turn.[3]

a. *Sexual innocence.* During her closing, the prosecutor stated:

"The other thing I asked you to consider was how would a 9-year-old child know about these numerous and very sexual acts that she testified to? Does the average 9-year-old child know about a man licking a female's vagina? Does the average 9-year-old little girl know about a man putting his penis in someone's mouth? . . . If a child has not experienced these things, how do they have all that sexual knowledge? [The victim] told you nothing like this had ever happened to her before. And not only did she tell you what her father did, she gave you details. . . . That is something a 9-year-old makes up? If a child doesn't experience sexual things, how do they make up that kind of detail?"

At the close of the argument, the defendant objected as follows:

"I also think that the argument that no 9-year-old child would know this, again, I think that's inappropriate argument, that there's no evidence before the jury what a 9-year-old might or might not know, and asking the jury to speculate regarding that is improper."

In response, the judge charged the jury:

"You're not to speculate about matters which were not presented in evidence . . . . So in short, you are to confine your deliberations to the evidence and on that alone decide the facts of this case. . . . Opening statements, closing arguments, objections of counsel, side-bar conferences, are all not evidence. And if, as I've said, if an attorney stated the evidence differently in closing argument than you remember it to be, you must rely upon your memory of the evidence, not what the attorney said that the evidence was."

This was a forceful charge that exceeded, to some degree, the

---

[3]As we consider the challenges to the prosecutor's closing speech, we are obliged once again to reiterate that lack of preparation and careless comments too often cause "defeat to be snatched from the jaws of victory."

instruction typically provided on the evidentiary value of argument. However, whether this charge was sufficient in the unusual circumstances presented here is a close question.

In Massachusetts, as in most jurisdictions, evidence of a victim's age-inappropriate sexual knowledge may be admitted for the purpose of supporting an inference of sexual abuse. As we stated in *Commonwealth* v. *Darby*, 37 Mass. App. Ct. 650, 654 (1994), "[w]e agree that evidence demonstrating a child's inappropriate sexual knowledge may be relevant in a sexual abuse case." Where such evidence is introduced, a defendant is entitled (provided an appropriate foundation for inquiry has been established, see *Commonwealth* v. *Savage*, 51 Mass. App. Ct. 500, 504 [2001]) to demonstrate the existence of alternative sources of such knowledge, including especially prior instances of abuse. See *Commonwealth* v. *Ruffen*, 399 Mass. 811, 815 (1987); *Commonwealth* v. *Scheffer*, 43 Mass. App. Ct. 398, 399 (1997).

However, a defendant's right, in appropriate circumstances, to plumb the background of a child victim for alternative sources of age-inappropriate sexual knowledge cannot be transformed into an obligation so to do. Such an approach would shift the traditional burden of persuasion, and thereby violate a defendant's due process rights. For this reason, Massachusetts does not impute any conclusive presumption of sexual innocence to child victims — a presumption that potentially would impose an unlawful burden of rebuttal on the defendant. Rather, a jury is merely entitled to consider evidence of precocious sexual knowledge as one factor potentially supporting an inference of abuse. While the defendant concedes that nothing in the judge's charge here suggested the existence of a legal presumption of sexual innocence, he asserts instead that the prosecutor's argument held the potential to suggest, at least implicitly, the existence of such a presumption.

We agree with the defendant that, as a general matter, a prosecutor may not rely in her closing on any implied or express presumption of sexual innocence for the purpose of urging the specific inference that age-inappropriate sexual knowledge evinced by a child victim *necessarily* was derived from the sexual acts that form the basis of the charges against a

defendant. Sadly, sexual abuse of children has become sufficiently endemic to render any such inference far too speculative to be deemed fair argument.[4] Rather, where a prosecutor wishes *expressly* to urge such an inference, there must be a firm evidentiary basis for the argument; that is to say, there must be some record evidence indicating that a child victim's knowledge of sexual matters was, in fact, derived from the abuse charged, and not from some other source.

The burden we impose is by no means onerous, particularly in view of the potentially strong inculpatory force of such argument. See *Commonwealth* v. *Scheffer*, 43 Mass. App. Ct. at 400-401 ("juror might well find the defendant guilty" on basis of evidence that sexual knowledge must have been derived from acts of abuse charged). In order to offer the type of closing at issue here, a prosecutor need only inquire whether a child victim had either suffered abuse on other occasions or had otherwise been exposed to sexually explicit materials. Indeed, that is more or less what occurred in this case. During direct examination on the subject of the defendant's repeated assaults, the prosecutor specifically asked the victim, "[h]ad anything like that ever happened to you before," to which the victim replied, "[n]o." Ideally, the prosecutor's inquiry should have been somewhat more extensive (i.e., should have included other potential sources of sexual knowledge besides the abuse alleged) to establish a proper foundation for her subsequent argument — and we will hold prosecutors to a higher standard in future cases — but, in the instant circumstances, we deem this minimally sufficient to support the contested argument.[5]

Our conclusion that the prosecutor's contested comments did

---

[4]In addition, as a result of the advent of the Internet, and ubiquitous access to same, children may be exposed to a wide variety of sexually explicit materials not previously available to them.

[5]We do not create any new rule of law here; rather, our holding merely represents a specific application of the familiar principle that a prosecutor, during her closing, may argue facts in evidence and "inferences that may be reasonably drawn from the evidence." *Commonwealth* v. *Coren*, 437 Mass. 723, 730 (2002) (reversal required where prosecutor's closing involved unsupported speculation about conversations between defendant and victim). It is our view that, absent any specific foundation in the evidence, it is simply not reasonable to infer that a child victim's precocious sexual knowledge was necessarily derived from any particular identified act of abuse; there are too

not amount to reversible error is bolstered by other factors, as well. In the first place, as noted, the judge gave a forceful charge on the proper use of closing argument, which charge we must presume the jury obeyed. Further, we note that the sexual precocity argument was not likely to have weighed heavily in the jurors' deliberations in this particular case. The victim was twelve years old at the time of trial (nine years old at the time of the sexual assaults). Jurors likely would have expected the victim to possess some knowledge of sexual matters. Had the witness been much younger, the impact of the prosecutor's argument would have been far greater. See *Commonwealth* v. *Rathburn*, 26 Mass. App. Ct. 699, 708 (1988) (jurors would have assumed some degree of sexual sophistication on part of thirteen year old witness). In any event, we believe that a marginally adequate foundation existed here for the prosecutor's argument vis-à-vis age-inappropriate sexual knowledge and, in any event, any error was insufficiently serious to warrant reversal.

One further point on this topic: it is important to note that nothing in our holding today should be construed to limit the use of evidence of age-inappropriate sexual knowledge as a factor supporting an inference of sexual abuse, particularly where such evidence is offered in the form of expert testimony concerning the clinical symptoms of sexual assault — the most common form in which such evidence is admitted. See *Commonwealth* v. *Dockham*, 405 Mass. 618, 627-630 (1989); *Commonwealth* v. *Frangipane*, 433 Mass. 527, 534 (2001), and cases cited therein (admission of expert testimony regarding symptoms of child sexual abuse). See also *Commonwealth* v. *Fredette*, 56 Mass. App. Ct. 253, 263-264 (2002). Rather, we simply have determined that where a prosecutor *expressly* urges in her closing that a child victim's sexual knowledge was

---

many other possibilities. It is also worth noting that arguments relating to a child victim's source of sexual knowledge almost never relate to collateral matters but rather, as a rule, run to the key issue in dispute; viz., whether a defendant committed the abuse alleged. As a result, courts cannot be too careful in ensuring that such argument has a proper foundation in the evidence. See *Commonwealth* v. *Pavao*, 34 Mass. App. Ct. 577, 581-583 (1993) (unsupported arguments must receive special scrutiny where they relate to key issues in dispute).

derived from *identified* acts of abuse, there must be an adequate and specific basis in the record for such a claim that excludes other possible sources of such knowledge.

While we have concluded that the prosecutor's argument concerning the victim's sexual knowledge was, on the face of the record, permissible, there remains another matter to consider. As the Commonwealth concedes, the government was aware that the victim had been informed of at least some of the details of a prior sexual assault committed by the defendant against the victim's older sister (which evidence had been excluded by pretrial order on a motion in limine). The prosecutor also knew that the prior assault involved conduct that was "almost exactly alike" the conduct that gave rise to the charges at issue here. In these circumstances, there is a serious question whether the prosecutor knowingly purveyed false or misleading information to the jury when she argued, in essence, that the victim could not have acquired knowledge of sexual matters from any source other than as a result of being abused by the defendant.

The Massachusetts Rules of Professional Conduct strictly forbid presenting false evidence to a tribunal. Specifically, Mass.R.Prof.C. 3.3(a)(4), 426 Mass. 1383 (1998), provides that "[a] lawyer shall not knowingly . . . offer evidence that the lawyer knows to be false." The relevance of rule 3.3(a)(4) to the present situation is plain: a lawyer is charged with applying her *actual* knowledge of facts in assessing whether or not she may adduce particular evidence, not merely record evidence or potential record evidence. Thus, were it clear that the prosecutor in this case had actual knowledge of an alternative source for the age-inappropriate sexual knowledge contained in the victim's testimony, it is likely that her argument vis-à-vis the inculpatory value of the victim's knowledge would amount to professional misconduct.[6] Further, where prosecutorial misconduct "is egregious, deliberate, and intentional . . . the 'drastic remedy' of dismissal of charges may become an appropriate

---

[6] If called upon to address the question, it is likely that we would include attorney argument under the rubric of "evidence" for the purposes of rule 3.3, despite the fact that argument does not constitute evidence strictly speaking. Cf. Mass.R.Prof.C. 3.3(e), 426 Mass. 1383 (1998) (barring defense counsel from making closing argument premised upon false evidence). The underlying purpose of rule 3.3 is to encourage general candor toward the tribunal.

remedy." See *Commonwealth* v. *Lewin*, 405 Mass. 566, 579 (1989), quoting from *Commonwealth* v. *Cronk*, 396 Mass. 194, 198-199 (1985).

Dismissal of a criminal complaint, however, is a severe sanction. See *Commonwealth* v. *Cronk*, 396 Mass. at 201; *Commonwealth* v. *Corbett*, 26 Mass. App. Ct. 773, 778-779 (1989). It may be imposed only where a defendant suffers substantial prejudice or the Commonwealth's malfeasance is particularly egregious. See *Commonwealth* v. *Olszewski*, 416 Mass. 707, 716-717 (1993), cert. denied, 513 U.S. 835 (1994). See also *Commonwealth* v. *Willie*, 400 Mass. 427, 432-433 (1987). After a careful examination of the record here, we conclude that there is not a sufficient basis for any remedial action in this case.

While the prosecutor was on notice that the victim had been informed of the prior abuse, it is at least plausible that she believed that the victim had been informed only of general details, insufficient to account for her graphic sexual knowledge. During the grand jury proceedings (the primary source of the prosecutor's knowledge of these matters, according to the defendant), a police officer testified that the victim's older sister, in describing the prior abuse, "did not get very specific, other than that some improper things and touching had occurred between her father and herself." The older sister "said that she thought [the victim] was too young to hear a lot of the details." The older sister "never provided the details of her abuse to [the victim]." This testimony was sufficient, if barely so, to justify the prosecutor's argument.[7]

Our conclusion that no misconduct occurred here should by no means be read as an endorsement of the prosecutor's actions. As the Rules of Professional Conduct make plain, a prosecutor is a purveyor of justice first, an advocate for conviction second. See Mass.R.Prof.C. 3.8, 426 Mass. 1397 (1998), & comment [1]. While the government here managed to skate a fine line

---

[7]At the same time, we note that there is at least some indication in the record of the grand jury testimony that the victim's older sister might have described the particulars of the abuse. At one point, the older sister indicated that the victim "asked her to describe what it felt like," possibly referring to an act of sexual intimacy, perhaps intercourse. On balance, however, as we have indicated, the record supports the view that the victim did not receive a detailed description of the prior abuse.

between proper argument and reversible error (or even bar sanctions), there was no justification for cutting things so fine. Were the facts changed but slightly, the outcome here easily could be different.

b. *Credibility of witnesses.* The defendant also complains that the prosecutor erred by suggesting that the victim was inherently credible merely because she testified at the trial while, at the same time, the defendant was inherently unreliable because of his stake in the outcome of the proceedings. The prosecutor stated, inter alia:

> "[The victim] has no motive to lie about what her father did. . . . [She] has nothing to gain by coming in this courtroom and telling you something that wasn't true. She has nothing to gain and she has no stake in the outcome of this case. But somebody else does. And let's talk about the defendant for a moment. . . . The defendant has a stake in the outcome of this case. The defendant has a motive to lie. [The victim] does not . . . Think about who has a motive in this case, who has a motive to not tell you the truth, who has a stake in the outcome of this case."

The defendant promptly objected to these portions of the prosecutor's argument, and the judge agreed that the statements were problematic, stating:

> "the area that jumps out at me is the victim, alleged victim, coming into court and, by doing so, being imbued with some greater credibility. I feel I must instruct the jury . . . I think I need to instruct the jury that they are not to draw any inference favorable to the witness simply because the witness appears in court."

Thereafter, the judge charged the jury that:

> "You are also not to be influenced by the impact that your verdict may have on anyone. . . . [T]he indictment against [the defendant] is not evidence. It is merely an accusation and a vehicle to bring this matter into court."

Later, the judge added:

> "I want to caution you . . . that the fact that a complain-

ing witness has come into court and testified before you does not entitle that witness to any greater credibility. And in fact, the mere fact that somebody has come into court to testify does not mean that their testimony is entitled to be believed by you because of the mere fact that they showed up in court and testified. *If you have been invited in the argument of counsel to make such an evaluation of a witness's testimony, I instruct you that you are to disregard that*" (emphasis added).

At the conclusion of the charge, defense counsel indicated that he was content with the curative instructions.

As an initial matter, there is no question that a prosecutor may use closing argument for the general purpose of marshaling the evidence in her favor, part and parcel of which is urging the jury to credit the testimony of the government's witnesses and to reject exculpatory evidence offered by the defendant. The court in *Commonwealth* v. *Shea,* 401 Mass. 731, 738-739 (1988), approved argument by the prosecutor "that only the defendant possessed a motive to lie." We note that, as in *Shea,* this was not a case in which the prosecutor improperly invited the jury to consider the consequences of their verdict during deliberations. See and compare *Commonwealth* v. *Burke,* 373 Mass. 569, 576 n.3 (1977); *Commonwealth* v. *Thomas,* 401 Mass. 109, 117 (1987). Accordingly, we find no fault with the government's statements along these lines — particularly in view of the fact that the chief theme of defense counsel's closing was that the victim had deliberately fabricated the charges against the defendant.

However, as the judge recognized, a prosecutor generally may not suggest that a victim — indeed any government witness — is inherently reliable merely because she subjected herself to the rigors of appearing in court. As we stated in *Commonwealth* v. *Riberio,* 49 Mass. App. Ct. 7, 10 (2000), "[t]elling the jury that the victims have no reason to lie is over the line of permissible advocacy." See *United States* v. *Moreno,* 991 F.2d 943, 947-948 (1st Cir.), cert. denied, 510 U.S. 971 (1993). Fortunately, this misstep on the part of the prosecutor, as noted above, was the subject matter of a cogent curative charge. Not only did the judge set out the correct standard for

Commonwealth *v.* Beaudry.

assessing the credibility of witnesses, but she also expressly admonished jurors to ignore any suggestion by counsel that a witness's "testimony is entitled to be believed by you because of the mere fact that they showed up in court and testified." We conclude that the judge's emphatic instruction was sufficient to cure any error.[8]

*Judgments affirmed.*

---

[8]Commendably, in the course of delivering her curative instructions, the judge correctly made specific references to the prosecutor's questionable statements.